# ORIGINAL

1  Duenas.rsp

2  LEONARDO M. RAPADAS
   United States Attorney
3  KARON V. JOHNSON
   Assistant U.S. Attorney
4  Suite 500, Sirena Plaza
   108 Hernan Cortez Avenue
5  Hagatna, Guam 96910
   Telephone: (671) 472-7332
6  Telecopier: (671) 472-7334

7  Attorneys for the United States of America

8

**FILED**

DISTRICT COURT OF GUAM

JUL 18 2007 *hba*

MARY L.M. MORAN
CLERK OF COURT

9          **IN THE UNITED STATES DISTRICT COURT**

10          **FOR THE TERRITORY OF GUAM**

11

12  UNITED STATES OF AMERICA,                 )   CRIMINAL CASE NO. _07-00039_
                                             )
13          Plaintiff,                        )
                                             )
14          vs.                               )   **GOVERNMENT'S RESPONSE TO**
                                             )   **DEFENDANTS' MOTIONS TO**
                                             )   **SUPPRESS EVIDENCE AND**
15  RAYMOND IGNACIO DUENAS, JR., and          )   **STATEMENTS**
    LOURDES CASTRO DUENAS,                    )
16                                            )
            Defendants.                       )
17                                            )
   _____)

18

19          **I. MOTION TO SUPPRESS EVIDENCE SEIZED**

20          Defendant has moved to suppress the evidence seized when a search warrant was

21  executed at his residence April 19, 2007. The first ground he asserts is that the officers did not

22  knock and announce their presence prior to executing the search warrant, in violation of the

23  Fourth Amendment. In this case, officers did announce their presence before entering

24  defendants' tent. Even had they not, however, their failure to do so would not justify suppression

25  of evidence seized pursuant to the search warrant. This issue was resolved in Hudson v.

26  Michigan, 126 S.Ct. 2159 (2006). There, officers waited between three to five seconds before

27

28                                          -1-

1  entering defendant's unlocked front door. The trial court granted his motion to suppress, on the
2  basis that the premature entry violated his Fourth Amendment rights. The Michigan Supreme
3  Court reversed, and the Supreme Court affirmed.

4  The Court acknowledged that <u>Wilson v. Arkansas</u>, 514 U.S. 927 (1995) held that the
5  knock-and-announce rule was a part of the Fourth Amendment's protections. This does not
6  mean, however, that any evidence seized after such a violation should be suppressed. The Court
7  analyzed the three reasons for the rule: an unannounced entry might provoke violence in support
8  of self-defense; the rule prevents the destruction of property, such as breaking down the front
9  door; and the rule protects "those elements of privacy and dignity that can be destroyed by a
10  sudden entrance." <u>Id.</u> at 2165. But the knock-and-announce rule has never protected "one's
11  interest in preventing the government from seeing or taking evidence described in a warrant." <u>Id.</u>
12  The court weighed the deterrence benefits of such a rule against its substantial social costs: the
13  exclusion of relevant incriminating evidence which would cause the release of dangerous
14  criminals into society, and the flood of claims alleging failure to follow such a rule, where a
15  violation depends on assessing what was the reasonable wait time in a particular case. The Court
16  concluded:

17  
18  
19  
20  

> "In sum, the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial-incomparably greater than the factors deterring entries when *Mapp* was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified." <u>Id.</u> at 2168.

21  Thus, even had Guam Police officers not announced their presence, such a failure would not

22  result in suppression of the evidence seized at defendants' residence.

23  Next, defendant alleges that the officers failed to follow Federal Rule of Criminal

24  Procedure 41(f)(1)(C) by not providing defendants a copy of the warrant and affidavit. The

25  Warrant, Attachment A listing the items to be searched for, and the Affidavit, are attached hereto

26  as Exhibit 1. Guam Police procedure is to photograph the defendant holding the Warrant, to

27  eliminate any doubt that he has received it. Officer Frankie E. Smith gave defendant Raymond

28  -2-

1  Duenas a copy of the entire set of documents; the photograph showing him in receipt of them is

2  attached hereto as Exhibit 2. When defendant was taken into custody, the documents were left

3  behind at his residence.

4      Officers are not required to give defendants a copy of the affidavit. The particularity

5  requirement of the Fourth Amendment requires that a person be advised of the scope of the

6  search warrant, to safeguard "the right to be free from unbounded, general searches." United

7  States v. McGrew, 122 F.3d 847, 849 (9th Cir. 1997). This particularity requirement can be

8  satisfied either by listing the objects of the search in the affidavit, and attaching the affidavit to

9  the warrant, or by listing the objects separately and attaching that list to the warrant. "If the

10  government wishes to keep an affidavit under seal, it must list the items it seeks with

11  particularity in the warrant itself. It is the government's duty to serve the search warrant on the

12  suspect, and the warrant must contain, either on its face or by attachment, a sufficiently particular

13  description of what is to be seized. Id. at 850. In this case, defendant received Attachment A

14  with the warrant.

15      Defendant also appears to argue that the fruits of the entire search should be suppressed

16  because the officers searched more than the residence and curtilage of the property. There is no

17  evidence to show that any search was conducted of the properties excluded by the warrant,

18  specifically a yellow concrete house and a shack. The voluminous evidence receipts do not

19  reflect that anything was taken from these locations. Defendant has cited no authority for the

20  proposition that evidence should be suppressed because of the manner in which the search was

21  executed.

22                      **II. STATEMENTS**

23  A. Lourdes Duenas

24      Lourdes was taken into custody and transported to the Tamuning Precinct later the

25  morning of April 19. S/A E.G. Picolo read her *Miranda* warnings about 12:30 p.m. She agreed

26  to make a statement and signed a waiver of rights, which is attached hereto as Exhibit 3. During

27

28                                      -3-

the interview which followed, she admitted that she and her husband Raymond had been

2    trafficking in ice for about a year, and had been taken stolen goods in exchange for ice. Agent

3    Picolo's summary of her statements is attached hereto as Exhibit 4. After the oral interview, she

4    made a brief written statement, attached hereto as Exhibit 5. Defendant has not alleged any facts

5    that would make her interview other than fully voluntary.

6    B. Raymond Duenas

7         Raymond and Lourdes were asleep in the tent/bedroom of their residence when officers of

8    the SWAT team announced their presence and entered. The area is barely 6'x6'; in the course of

9    entry, someone stepped on defendant's ankle. After his arrest, he complained about pain in his

10   ankle and his sterum Medics were already on hand treating defendant's mother; they looked at

11   defendant but could not determine the extent of injury. Defendant was transported to the

12   Tamuning Precinct. When he was brought into an interview room, DEA S/A Michelle Jong

13   noticed he was limping and asked if he was okay. Defendant said his ankle and back hurt, and

14   Jong asked if the paramedics could be called. While awaiting the paramedics, Jong advised

15   defendant of his Miranda warnings, and said she wanted to talk to him about his drug trafficking.

16   When asked if he wanted to make a statement, defendant's response was equivocal, that he had

17   cooperated with law enforcement before, and it had not been a positive experience. The medics

18   arrived and defendant was taken to Guam Memorial Hospital by officers Smith and Picolo,

19   where his ankle was X-rayed and found not to be broken. Defendant recognized Smith: some

20   12 years ago they had both been employed with the former Islandwide Cable company as

21   installers. Defendant attempted to talk to Smith about his arrest, but Smith told him not to make

22   any statements until the medical procedures were completed. Defendant was returned to the

23   precinct about 3:15 p.m. by other officers, and Smith and Jong were notified he was back.

24        Jong and DEA S/A Than Churchin re-advised defendant of his *Miranda* rights and

25   advised him they had found guns as his residence. Jong explained to defendant that he had

26   several options under the federal system, such as to cooperate and attempt substantial assistance

27

28                                              -4-

Case 1:07-cr-00039    Document 46    Filed 07/18/2007    Page 4 of 31

in the hopes of a lighter sentence. She said that if he wanted to cooperate, they could get him an attorney immediately. Defendant told them he wanted an attorney, and they stopped questioning him. Jong called the Federal Public Defender. In the meantime, Officer Smith arrived, and told defendant he was investigating the property crimes related to his arrest. Defendant said he would talk to Smith, he just didn't want to talk to the "Feds," that the Feds scared him. Michelle Jong noticed they were talking and asked if they wanted her to be present; defendant signified no.

Smith re-advised defendant, and defendant signed a waiver of rights about 3:45 p.m.. Smith's summary of the interview is attached hereto as Exhibit 6, defendant's waiver as Exhibit 7, and defendant's written statement as Exhibit 8.

The government has the burden of proving that defendant's statement was voluntary. Lego v. Tworney, 404 U.S. 477, 489 (1992). Whether a confession is deemed voluntary depends on the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226-67 (1973). Edwards v. Arizona, 451 U.S. 477 (1981) established a rigid prophylactic rule: if at any point during an interrogation a suspect invokes his right to counsel, all questioning must cease and may not be resumed in the absence of counsel unless the suspect himself initiates the further discussion. Smith v. Illinois, 469 U.S. 91, 95 (1984).

In this case, defendant is a 33-year-old man who has prior felony convictions for Theft, Possession of a Controlled Substance, Terrorizing and Possession of a Firearm without a Valid Identification. In short, he is a mature man with a thorough knowledge of the criminal justice system. He was advised of his *Miranda* rights on three separate occasions after his arrest, twice by S/A Jong and once by Officer Smith. He indicated he did not want to talk to federal investigators, but he had told Smith at the hospital that he wanted to talk to him about his arrest. When Smith contacted him later, he told Smith he would talk to him, but not the Feds. Smith confirmed that defendant thoroughly understood his rights by advising him yet again, and

//

//

-5-

1  defendant executed a waiver to that effect.  In the totality of the circumstances, his confession
2  was voluntary.

3      Respectfully submitted this __18th__ day of July 2007.

4                                          LEONARDO M. RAPADAS
                                           United States Attorney
5                                          Districts of Guam and NMI

6

7                           By:      _____
                                     KARON V. JOHNSON
8                                    Assistant U.S. Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                   -6-



# IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| **THE PEOPLE OF GUAM** | ) | **SEARCH WARRANT NO.** |
| | ) | |
| | ) | |
| **vs.** | ) | |
| **Raymond I. DUENAS JR Defendent** | ) | **SEARCH WARRANT** |
| **SS# 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** | ) | |
| **And** | ) | |
| **Lou-LNU** | ) | |
| **F/ possibly Cha** | ) | |
| **Ysengsong Road** | ) | |
| **Dededo, Guam** | ) | |

An affidavit having been sworn before me on this 18th day of April 2007, by

Officer Frankie E. Smith and probable cause having been shown by said affidavit that

the residence described as a single story, white colored semi-concrete structure, in

Dededo, Guam. A red transport container is located south of the main residence. A

makeshift storage room with "Prop B" displayed around the storage room. A white tent

is located east of the main entrance. A sign displaying "DUENAS" is displayed on

Ysengsong Road, Dededo, Guam. The structure contains evidence of narcotic

trafficking, such as methamphetamine, paraphernalia commonly associated with it's

use and sale, firearms, cash, jewelry, records, concerning the acquisition of assets

1

related to narcotics trafficking, and articles of personal property tending to establish the identity of the person or persons in possession or control of the above described premise(s).

**IT IS HEREBY ORDERED** that Officer Frankie E. Smith and all peace officers of Guam, shall conduct a search of the above described location(s), curtilage, and *not including the "shack house" and "yellow house there"* persons present therein and to seize the items mentioned in "Attachment A." *shown in Attachment B.*

This warrant must be executed within ten (10) days from issuance hereof, and *later* officer(s) executing this warrant are hereby ordered to promptly return this warrant to the undersigned judge, together with a written inventory of all property seized pursuant to this warrant, said return to be made in no case later than ten (10) days from the execution/issuance hereof. This warrant may begin execution during "All hours of the Night," pursuant to 9 G.C.A., Chapter 67, Subsection 67.502.2.

Dated this 18th day of April 2007. Time now _5:05pm_

Katherine A. Maraman

JUDGE, SUPERIOR COURT OF GUAM

2

## Attachment A

### LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

**a)**     controlled substances, in particular but not limited to; methamphetamine

**b)**     methamphetamine processing and distribution equipment such as scales, cutting devices cutting materials, and packaging materials.

**c)**     written records and documents concerning methamphetamine processing and distribution

**d)**     firearms and explosives devices

**e)**     items of identification such as letters, bills, receipts, photographs, vehicle registrations, and the like;

**f)**     illegally obtained proceeds derived from violations of federal or state statutes concerning felony possession, distribution, and or manufacturing of controlled substances, such as U.S. currency, gold, silver, stocks, bonds, expensive electronic equipment and the like;

**g)**     books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the transportation, ordering, sale and distribution of illicit controlled substances, to wit: methamphetamine.

**h)**     currency, financial instruments, precious metals, jewelry, vehicle registration receipts, property titles, and other items of value and/or proceeds of drug transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illicit controlled substances.

**i)**     other records evidencing significant cash expenditures, such as aircraft, boats, vehicles, and other items of value that are the proceeds of illegal drug transactions, and further showing the concealment of the source and ownership of such cash, proceeds, and items of value by use of false names, aliases, postal box addresses, addresses of relatives and acquaintances, sham corporations, and other such devices.

**j)**     telephone and address books or papers that reflect names, addresses, and/or telephone numbers for their associates in dealing in illicit controlled substances and persons or entities from whom proceeds of drug transactions or other items of value have been obtained and in what manner said proceeds are presently maintained.

**k)**     photographs of individuals, property, and illicit controlled substances.

**l)**     identification documents, and other papers indicating that the persons associated with the organization described within this Affidavit are presently using aliases and assumed names other than their names and are representing themselves to others under these assumed or alias names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities.

**m)**     vehicles and other conveyance described within this Affidavit that are used to facilitate illegal drug trafficking

main road

Dirt road

Dogs

Dogs

Pit Bull Area

garage

main house

storage container

Frontier

Drug room

Storage

Low room / Boy's room

Kitchen

Shuck house

← Yellow concrete house

Attachment B

Still concrete

main house

Living room

4/16/07

# IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| **THE PEOPLE OF GUAM** | ) | **SEARCH WARRANT NO.** |
| | ) | |
| vs. | ) | **AFFIDAVIT FOR** |
| **Raymond I. DUENAS JR** | ) | **SEARCH WARRANT** |
| **SS# 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**    **DEFENDANT** | ) | |
| **And** | ) | |
| **Lou- LNU** | ) | |
| **F/ possibly Cha** | ) | |
| **Ysengsong Road** | ) | |
| **Dededo, Guam** | ) | |
| | ) | |

Comes now, Police Officer Frankie E. Smith, a duly appointed officer with the Guam Police Department assigned to the Neighborhood Patrol Division, and upon his oath, information and belief, alleges as follows:

## A.    Background of Affiant

1. I am a Guam Police Officer currently assigned to the Neighborhood Patrol Division. I have been employed with the Guam Police Department (GPD) for about ten (10) years and have been assigned to Tumon Precinct Command for four (4) years, to include Tumon Precinct's Uniform Crime Suppression unit. Prior to this assignment, I was assigned to the Violent Street Crimes Task Force as a Task Force Officer. During my previous assignment, I have made numerous arrests of drug trafficking suspects and confiscated illegal controlled substances such as methamphetamine a.k.a. "ice," firearms and marihuana. I have attended training consisting

of drug detection and identification, methods and procedures used by drug organizations to import and distribute narcotics.

Additionally, I have participated in arrests which pertained to the distribution of controlled substances while being assigned with the Dededo Precinct and the Violent Street Crimes Task Force. I have debriefed and directed informants in gathering narcotic intelligence and conducting controlled buys of narcotics.

2. I have communicated with law enforcement personnel who specialize in the area of documentation and detection of proceeds from drug trafficking. I have experience in debriefing numerous defendants, informants and witnesses who have personal knowledge of drug organizations. Such individuals often have personal information as to the transportation and distribution of money and drugs in large-scale controlled substance distribution operations.

3. I know from experience that importers and distributors of controlled substances often keep ledger books, bank records, telephone records, receipts, airline tickets, drug customer lists, photos and other papers that relate to the importation, transportation, ordering, purchasing and the distribution of controlled substances and proceeds derived from said sales in paper documents or in data banks stored in personal/business computers and similar devices.

4. I know from experience that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their premises for ready access and to conceal them from law enforcement authorities. I also know that persons involved in drug trafficking conceal in their premises caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to

obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities. I also know the courts have recognized

that cash wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

5. I also know from my experience that when drug traffickers amass large proceeds from the sale of drugs, that drug traffickers often attempt to legitimize these profits. To accomplish this, drug traffickers utilize, but are not limited to, domestic and foreign banks and/or financial institutions and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

6. I know from my experience that it is common practice for narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking. After purchasing narcotics, these narcotics traffickers will transport or cause to be transported narcotics. The methods of transportation include, but are not limited to, commercial airlines, commercial ocean going vessels, private automobiles, government and contract mail services. The methodology of the traffickers results in the maintenance of travel documents and Customs and Immigration forms of foreign countries.

7. It is my opinion, based on experience gained during the service of numerous search warrants, that persons involved in the trafficking of narcotics almost always keep records of their narcotic transactions. The trafficking of narcotics generates huge sums of money that require the keeping of detailed records. On many occasions, I have observed handwritten notes which depict narcotic transactions in pay-and-owe records and in customer lists complete with

telephone number and addresses. These records are kept by narcotics dealers whether or not the dealer is in actual possession of narcotics at any given moment.

8. It is also my opinion, based on training, experience, and observation, that the trafficking of large amounts of narcotics requires the cooperation and association of a number of people within a narcotics distribution organization. As a result, persons who traffic in narcotics will possess documents that identify other members of the organization, such as telephone books, address books, telephones bills, and documents containing lists of names.

9. In virtually all locations I have searched pursuant to a search warrant, I have personally observed utility bills pertaining to the location and personal letters addressed to occupants of the location. It is my opinion that within any location searched there will be keys that fit location locks, wallets, purses, diaries, and luggage tags, all of which contain in, or upon them, some personalization that tends to identify the owners thereof, thus, circumstantially identifying the occupant of the premises for the purpose of arrest, identification, and crime charging.

10. It is my experience that records and paraphernalia such as weighing devices (scales), cutting material, and containers are permanently possessed by narcotic traffickers in much the same way a business will maintain records and tools of its trade, whether or not the business has a particular item in inventory on a given day.

11. I know from my training and experience that drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product, and these traffickers usually maintain these photographs at their premises.

12. Based on my training and experience, drug traffickers commonly have in their possession, that is on their person, at their residences and/or their stash houses, firearms,

including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to narcotics, jewelry, narcotic paraphernalia, books, records and United States currency.

13. It is my opinion that the seizure of these items, despite any lapse of time between the events described and the anticipated search by this warrant, will provide evidence of the events reported in this affidavit, and that the items have and will be used to aid in the commission of felony narcotics transactions.

14. I also have extensive experience, knowledge and experience investigating property crimes as a patrol officer. I would initiate criminal complaints, conduct follow up investigations, effectuate arrests, identify and confiscate evidence.

B.  **Purpose of Affidavit:**

1 On April 17, 2007, Tumon Precinct's Uniform Crime Suppression made contact with Source of Information (hereafter referred as SOI) regarding illegal drug activity in a residence located on Ysengsong Road, Dededo, Guam. The SOI stated the suspect, identified as Raymond I. DUENAS JR, is in possession of stolen property inside his residence which he keeps for himself for personal use. The SOI indicated large amounts of stolen property were seen inside makeshift storage rooms and stolen vehicles located east of the single story, semi-concrete structure. The SOI stressed that weapons of various caliber are inside the residence and are easily accessible to anyone. In addition, the SOI indicated he could solicit the sell of methamphetamine from Lou-LNU and or DUENAS. 2. During late evening hours a controlled meet with DUENAS and Lou-LNU was conducted at their residence on Ysengsong Road,

Dededo, Guam. The SOI was escorted to the residence and successfully received suspected methamphetamines from Lou-LNU. The SOI left the residence and was escorted by the police to a predetermined location. Officer John E. San Nicolas later conducted a field test of the suspected methamphetamine, which was presumptive positive for amphetamines. Due to the weapons inside residence and the distribution of methamphetamines during the late hours, your affiant respectfully "All hours of the night" under Title 9,G.C.A., Chapter 67,subsection 67.502.2. Based upon the foregoing, your affiant has probable cause to believe that the following items indicated on **Attachment "A"** will be found in the aforementioned residence and its curtilage.

Frankie E. Smith
Guam Police Officer II .

SUBSCRIBED AND SWORN TO ME THIS 18th DAY OF APRIL 2007, TIME NOW 5:5 p.m

JUDGE, SUPERIOR COURT OF GUAM

## Attachment A

### LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

a) controlled substances, in particular but not limited to; methamphetamine

b) methamphetamine processing and distribution equipment such as scales, cutting devices cutting materials, and packaging materials.

c) written records and documents concerning methamphetamine processing and distribution

d) firearms and explosives devices

e) items of identification such as letters, bills, receipts, photographs, vehicle registrations, and the like;

f) illegally obtained proceeds derived from violations of federal or state statutes concerning felony possession, distribution, and or manufacturing of controlled substances, such as U.S. currency, gold, silver, stocks, bonds, expensive electronic equipment and the like;

g) books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the transportation, ordering, sale and distribution of illicit controlled substances, to wit: methamphetamine.

h) currency, financial instruments, precious metals, jewelry, vehicle registration receipts, property titles, and other items of value and/or proceeds of drug transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illicit controlled substances.

i) other records evidencing significant cash expenditures, such as aircraft, boats, vehicles, and other items of value that are the proceeds of illegal drug transactions, and further showing the concealment of the source and ownership of such cash, proceeds, and items of value by use of false names, aliases, postal box addresses, addresses of relatives and acquaintances, sham corporations, and other such devices.

j) telephone and address books or papers that reflect names, addresses, and/or telephone numbers for their associates in dealing in illicit controlled substances and persons or entities from whom proceeds of drug transactions or other items of value have been obtained and in what manner said proceeds are presently maintained.

k) photographs of individuals, property, and illicit controlled substances.

l) identification documents, and other papers indicating that the persons associated with the organization described within this Affidavit are presently using aliases and assumed names other than their names and are representing themselves to others under these assumed or alias names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities.

m) vehicles and other conveyance described within this Affidavit that are used to facilitate illegal drug trafficking



EXHIBIT 2

 CRIMINAL INVESTIGATION DIVISION 

SPECIAL AGENT:      S/A E.G. PIOLO                    Supplement
CASE NUMBER:        KY# 07-08964
CLASSIFICATION:     BURGLARY

Agent Piolo had contacted Stephen Roberto who is the son of **Annie Roberto** (CS#07-7296, Complainant) and inquired if he can identify his mother's washer, to which he indicated that the washer has a bluish design on the face of the control panel area and that it is in good condition. Agent Piolo noted that the washer in question is identical to the washer that Stephen had described.

## INSTRUCTIONS RECEIVED:

On Thursday, April 19, 2007 at about 10:30am, Agent Piolo had received instructions from Officer Smith to accompany him to the Tumon-Tamuning Precinct to conduct the interviews of Ray and his wife **Lourdes Castro Duenas** in reference to GPD CS# 07-08964, where a Large Plasma Screen television set, located in the living room area of the residence was identified to be stolen by **SWAT Officer F.M. Camacho**, who's residence was burglarized. Agent Piolo and Officer Smith then proceeded accordingly. Agent Piolo was then tasked to interview Lourdes.

## LOURDES MET:

At about 12:15pm, same date, Agent Piolo met with Lourdes at the Tumon-Tamuning Precinct Command and informed her of the nature of his presence, to which she acknowledged and understood.

## RIGHTS ADVISED:

At about 12:30pm, same date, Agent Piolo advised Lourdes of her Miranda rights via rights form, to which she acknowledged and understood her rights by signing form. **See attached form for details.**

## LOURDES INTERVIEWED:

At about 12:40pm, same date, Agent Piolo interviewed Lourdes, to which she stated the following:

S/A E.G. PIOLO ID# 664                 CASE STATUS                 PO3 D.C. MASNAYON #292
    *Assigned officer*      □ OPEN    □ CLOSED    □ SUSPENDED        *Approving Supervisor*

Forwarded to:   □ Attorney General's Office   □ Criminal Investigation Section   □ Violent Street Crimes   □ Others: _____

*Page 2 of 7*

 CRIMINAL INVESTIGATION DIVISION 

SPECIAL AGENT:     S/A E.G. PIOLO        Supplement
CASE NUMBER:     KY# 07-08964
CLASSIFICATION:     BURGLARY

- That she has been married to Ray Duenas for about four years and that they have no children together.
- That she and Ray used to work at MCV (Marianas Cable Vision) together.
- That they have lived together at the residence in question for about two years.
- That the property belongs to her mother-in-law, namely **Catalina Duenas** under Chamorro Land Trust.
- That they survive off Catalina's Social Security and food stamps.
- That she and Ray have been receiving stolen goods at the said residence for a total of one year.
- That they have knowledge of every item delivered by their friends to be stolen and that they give illegal drugs (ICE) or cash for the exchange of the stolen goods
- That their friends **John Untalan, James Pangelinan and Joseph Jones** exchange stolen goods for cash or ICE.
- That John Untalan operates a **Gray 4door Toyota Tercel** and that Joseph Jones resides in the Talofofo area.
- That everything found in the 40foot container at their residence are stolen goods, except for the plastic totes and plastic cabinets.
- That she was present when John Untalan had exchanged two large plasma screen television sets for ICE, to Ray.
- That a Golf Cart like vehicle was sold (unknown amount) to Ray by their friend **Frank Acfalle (Note:** Said vehicle was later identified to be stolen).
- That a Green Nissan Frontier was given to them by their friend **Eli** who looks Korean, for parts and that she has proper documents for it.
- That Eli operates a **White station wagon** when he arrives at their residence.

S/A E.G. Piolo, ID# 664
*Assigned officer*

CASE STATUS
☐ OPEN    ☐ CLOSED    ☐ SUSPENDED

pro D. C. Masanga J #232
*Approving Supervisor*

Forwarded to: ☐ Attorney General's Office   ☐ Criminal Investigation Section   ☐ Violent Street Crimes   ☐ Others: _____

**Page 3 of 7**




# CRIMINAL INVESTIGATION DIVISION

Supplement

**SPECIAL AGENT:**     S/A E.G. PIOLO
**CASE NUMBER:**     KY# 07-08964
**CLASSIFICATION:**    BURGLARY

- That a "Whirlpool" washing machine was delivered by Joseph Jones and John Untalan, which was later exchanged for ICE.
- That a Green Honda Accord was also given to them by Eli for parts and that she also has proper documents for it.
- That a large generator that is located by the kitchen area is also stolen and that it was dropped off by John Untalan and swapped for ICE.
- That most the items found In the make shift storage room areas are also stolen, such as, Power tools, Electronics, Audio equipment, Heavy Equipment hand tools and Power tools, Kids Dirt Bikes, Miscellaneous Jewelry, Karaoke Systems, Computer Systems, Computer Accessories, Auto rims and tires and Custom auto rims, Split Air-Con Units and Window Air-Con Units, Bushcutters, generators and compressors.
- That the custom rims that can be found in a red pick-up truck at their residence are stolen and that it was obtained from **Antonio Ayuyu** and swapped for ICE.
- That the construction materials for their residence are mostly bought with Catalina's money, which she receives through social security, except for the one hundred and twenty five hollow blocks that James Pangelinan had brought, which was swapped for ICE and later used. She further indicated that some floor tiles were also swapped for ICE.
- That when James Pangelinan brought said hollow blocks, she had asked him as to where he got them, to which he stated "Just around the corner" and did not give any specific locations.
- That all the stolen jewelry they obtain·is swapped for ICE and that John Untalan is usually delivering stolen jewelry and that he would tell her not to sell it anywhere and to just hold on to it.
- That all the jewelry on her person is stolen, but she does not know where it was stolen from and that it was obtained from John Untalan.

S/A E.G. Piolo, ID# 664
*Assigned officer*

*CASE STATUS*
☐ *OPEN*    ☐ *CLOSED*    ☐ *SUSPENDED*

Po3 D.C. Lisangton #232
*Approving Supervisor*

Forwarded to:   ☐ Attorney General's Office   ☐ Criminal Investigation Section     ☐ Violent Street Crimes   ☐ Others: _____

 

# CRIMINAL INVESTIGATION DIVISION

**SPECIAL AGENT:**    S/A E.G. PIOLO      Supplement
**CASE NUMBER:**    KY# 07-08964
**CLASSIFICATION:**    BURGLARY

- That when their friends drop off stolen goods they either go to Ray or to her, depending who is home at the time. Sometimes they received the stolen goods together.
- That all the laptops found at the residence are stolen and swapped for ICE.
- That she thinks Catalina suspects their illegal activities, but Catalina has never asked them and that they try and hide it from her.
- That **Richard Palomo** is related to Ray and that he lives with them and has knowledge of their illegal activities.
- That Palomo also smokes and sales ICE with them, but he does not receive stolen goods.
- That she is not aware of any firearms being accepted and exchanged for ICE. She indicated if there were any firearms found at their residence, then it was not her who accepted it and that it may have been Ray.
- That Ray is the one who obtains the ICE from his source and brings it back to their residence.
- That she usually gets her share of ICE from whatever amount of ICE he receives and that she makes her profit from her share.
- That if she does not have any ICE to sell or smoke for her personal use, she would purchase what she needs from Ray.
- That she usually receives one gram of ICE for herself.
- That Palomo also receives his share of ICE from whatever amount Ray receives and that she has no knowledge as to who is Ray's source is.
- That she is not sure if any of the dogs (Pit bulls) at her residence are stolen and that Ray is the one usually caring for them.
- That they are involved in such illegal activity, because it's the only they can make a living.
- That the last time she smoked ICE was last night (4-18-07) with Ray and some friends.

S/A E.G. PIOLO, ID# 664
*Assigned officer*

CASE STATUS
☐ OPEN    ☐ CLOSED    ☐ SUSPENDED

po3 D.C. KUSAVIMON #232
*Approving Supervisor*

Forwarded to:   ☐ Attorney General's Office   ☐ Criminal Investigation Section    ☐ Violent Street Crimes   ☐ Others: _____

**Page 5 of 7**

 

**SPECIAL AGENT:** S/A E.G. PIOLO          Supplement
**CASE NUMBER:** KY# 07-08964
**CLASSIFICATION:** BURGLARY

- That she can't recall as to who and where the items had come from because there is too many and that they have received some along time ago.
- That Ray may have more knowledge as to what they received and who has been delivering stolen goods.
- **Refer to attached written statement for details.**

## SUSPECT BREAKDOWN:
- John Untalan
- James Pangelinan
- Joseph Jones
- Frank Acfalle
- Eli (Korean looking male individual)
- Hansel Chamberlain

## NOTE:
Agent Piolo had apprised Officer Smith of the details of Lourdes' interview in reference to the investigation.

## ADDITIONAL INFORMATION:
At about 5:45pm, same date, Agent Piolo was informed by Officer Smith that he was informed by Assistant Attorney General Diane Corbett, that Lourdes has an outstanding warrant for her arrest, which was issued on 4-19-07. Agent Piolo acknowledged.

## ARREST MADE:
At about 6:00pm, same date, Agent Piolo had placed Lourdes under arrest in reference to Arrest Warrant No. CF#174-07, Lourdes was later processed and booked and confined. **Refer to arrest report GPD CS#07-11225.**

| S/A E.G. Piolo ID# 664 | CASE STATUS | | | po3 D.C. MASONA ID #232 |
| Assigned Officer | ☐ OPEN | ☐ CLOSED | ☐ SUSPENDED | Approving Supervisor |

Forwarded to: ☐ Attorney General's Office  ☐ Criminal Investigation Section   ☐ Violent Street Crimes  ☐ Others: _____

 CRIMINAL INVESTIGATION DIVISION 

**SPECIAL AGENT:**     S/A E.G. PIOLO        Supplement
**CASE NUMBER:**     KY# 07-08964
**CLASSIFICATION:**    BURGLARY

## ATTACHMENT:
- Custodial Interrogation form.
- Written statements.
- 2 pages of investigative field notes.
- Copy of arrest report.

## CASE REFERENCE:
- Refer to all supplements and reports submitted under GPD CS#07-09564.
- Refer to original copy of arrest report GPD CS#07-11225 for details.

## INDEXING:
- **Lourdes Castro DUENAS**
  SSN# 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 / DOB: 2-10-67
  Female / Chamorro / AGE: 40
  ADD: Blk# 10141-1-4-3, Rt.28, Y-Seng-Song Road Dededo, Guam /
  HM# 868-5309
  POE: Unemployed

## NOTE:
The written statement form and Custodial Interrogation form was accidentally mixed with paper work that was prepared for disposal and ripped. Scotch tape was then applied at the center of both forms for re-attachment.

**CASE CLOSED. FORWARD TO AG'S OFFICE FOR THEIR
INFORMATION AND DISPOSITION. ATTACH TO PRELIMINARY REPORT
AS ADDITIONAL INFORMATION AND REFERENCE TO COMPILATION
CASE# 07-09564**

S/A E.G. PIOLO ID# 664      *CASE STATUS*      PO3 D.C. KRISNAMPJ #232
*Assigned officer*     ☐ OPEN    ☐ CLOSED    ☐ SUSPENDED     *Approving Supervisor*

Forwarded to:   ☐ Attorney General's Office   ☐ Criminal Investigation Section    ☐ Violent Street Crimes   ☐ Others: _____

# CUSTODIAL INTERROGATION

## Y O U R   R I G H T S

Case No.: _PY# 07-00964_
Place: _TUMON - TAMUNING PRECINCT_
Date: _4/19/07_
Time: _12:30pm_

NAME: _Lourdes C. Duenas_

Before we ask you any questions, you must understand your rights.

Do you understand? _yes Leo_

You have the right to remain silent. You do not have to talk to me unless you want to do so.

Do you understand? _yes Leo_

Anything you say can and will be used against you in a court of law.

Do you understand? _yes Leo_

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

Do you understand? _yes Leo_

If you cannot afford a lawyer, one will be appointed to your before questioning if you wish.

Do you understand? _yes Leo_

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

Do you understand? _yes Leo_

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signature: _Lourdes C. Duen_

WITNESS: _____

WITNESS: _____

GPD - 9
Rev. 2/95

Place Statement Taken: Timor - Tamuning Precinct Command    Police Case Number: PYK07-08964

Name: Lourdes C. Duenas    Nationality: CHam.    Time: 1:13 pm Date: 4/19/07

Address: Yseng Song    DOB: 2-10-67    Home Telephone Number: 868-530.

CI/ID/SER:
SS Number: 586 -14-1800    Occupation: House Wife

Employed By: _____    Business Telephone No.: _____

**AFTER BEING ADVISED AND UNDERSTANDING MY CONSTITUTIONAL RIGHTS, I AM GIVING THE FOLLOWING STATEMENT FREELY AND VOLUNTARILY.**

I Lourdes C Duenas married to Ray Duenas we lived with his mom Cathalina Duenas, & daughter Arlene, AT 4/19/07 6am this morning all officers are coming in the premerses. and they found alot of Items, suchs as Bush cutters, generator, cars, laptops jewerly pocket Bills Runs & Tires, mostly all the Items come from John Untalan James pangilinan, Antonio Ayuyu Elai & Frank attague ACD ACFAlli My Husband and I, ve both aware of what's going on. that the Item are Stolen, we exchange Dope & (Ice) each to merchadise.

THE ABOVE IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

WITNESS(ES) SA T.C. PHO, IDFLEY    SIGNATURE: Lourdes C. Due

WITNESS(ES) _____    TIME: 1:40 pm DATE: 4/19/07

TIME: 1:40pm    DATE: 4.19.07

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ 20 ___.

NOTARY PUBLIC IN AND FOR THE TERRITORY OF GUAM

Synopsis:

On April 19, 2007, the Tumon Precinct Uniform Crime Suppression team and participating officers executed a search warrant at a residence located on Route 28, Dededo, Guam. The result of the investigation led to the seizure of stolen goods and contraband found inside the residence and storage areas. Refer to Guam Police Department case number 2007-11046, Confiscated Contraband, for details of investigation.

Details:

**N**
**A**
**R**
**R**
**A**
**T**
**I**
**V**
**E**

**S**
**U**
**P**
**P**
**L**
**E**
**M**
**E**
**N**
**T**

1. Reference is made to all reports of investigation under the Guam Police case numbers 2007-08964, Burglary and 2007-11046, Confiscated Contraband.

2. April 19, 2007, Tumon Precinct's Uniform Crime Suppression team, executed a search warrant at Lot 10141-1-4-3, a residence located on Route 28 located in Dededo, Guam owned by Raymond Ignacio DUENAS JR and Lourdes Castro DUENAS. Refer to Guam Police case number 2007-11046, Confiscated Contraband for details of confiscation and seizure.

3. During the course of the search a television, Sony Wega 52" plasma screen, was located near the wall inside the residence. Ofcr. Frankie E. Smith recalled debriefing a Source of Information (hereafter refer to as SOI) that a Sony plasma TV was stolen from a police officer's residence in the Chalan Pago area. Incidentally, Ofcrs. Smith, Luke S. Ishizaki and S/A Elbert Piolo took the SOI to various residences that were burglarized. The SOI brought us to Ofcr. Camacho's residence which he/she identified the residence the Sony TV was stolen from.

4. While at scene, Ofcr. Smith ascertained an abstraction of the officer's list of stolen items which identified a Sony Wega 52" plasma screen TV. The plasma TV displayed the following model/serial number KDF50A10/8193870.

5. Ofcr. Felix C. Camacho arrived and was escorted onto the property to verify if the TV was indeed his, verified by the owner's manual that contained the model/serial number. Refer to Ofcrs. Audrey J. Mashburn's preliminary report under Guam Police case number 2007-11156, Confiscated Property for custody release of the item.

6. At about 10:45 a.m., Ofcr. Smith was instructed by Sgt. Rock J.B. Anciano to proceed to the Guam Attorney General's office to meet with Assistant Attorney General Diane Corbett and brief her regarding the ongoing investigation. The appointment was scheduled for 1:00 p.m.

7. At about 10:45 a.m., Ofcr. Smith and S/A Piolo proceeded to Tumon Precinct Command to interview DUENAS and L. DUENAS who were detained at the precinct.

8. At about 11:15 a.m., while en route to the police station, Ofcr. Smith received a call from Tumon Precinct deskwatch that DUENAS was being transported to Guam Memorial Hospital for complaints of pain in his ankle and chest area. Ofcrs. Smith and Piolo acknowledged and escorted DUENAS to the Guam Memorial hospital.

9. At about 11:30 a.m., Ofcrs. Smith and Piolo arrived at Guam Memorial Hospital for stationary assignment. While at the emergency room, DUENAS looked over to Ofcr. Smith, and mentioned that he wanted to talk him regarding the items inside his residence. Ofcr. Smith informed him (DUENAS) not to speak regarding the investigation until he was properly advised of his constitutional rights. DUENAS agreed to wait, however, insisted he wanted to talk to Ofcr. Smith. SWAT team members later assumed the stationary assignment.

10. At about 3:20 p.m., Ofcr. Smith received a call from Tumon Precinct Command, via phone, that DUENAS had returned from the hospital and is awaiting for him. Ofcrs. Smith and Piolo proceeded back to the police station to conduct the interview.

11. At about 3:42 p.m., Ofcrs. Smith and S/A Piolo arrived at Tumon Precinct Command and met with DEA Agent Michelle Jone who attempted to talk to DUENAS. However, DUENAS had related to the agent that he did not want to talk to her but wanted to talk to a local police officer, having establish a dialog with him earlier. Ofcr. Smith informed Agent Jone that he will meet with DUENAS and talk to him.

12. At about 3:45 p.m., while at Tumon Precinct Command and in the presence of S/A Piolo, Ofcr. Smith advised Raymond I.

| REPORTING OFFICER SIGNATURE / ID | SECOND OFFICER SIGNATURE / ID | APPROVING SUPERVISOR SIGNATURE / ID |
|---|---|---|
| 585 Smith Frankie | | 150 Wade Scott |

Case 1:07-cr-00039    Document 46    Filed 07/18/2007    Page 27 of 31

EXHIBIT 6

(Narrative Continued)
DUENAS JR of his constitutional rights, via Guam Police Interrogation rights form, which he acknowledged, understood, and waived by signing the aforementioned form. DUENAS provided an oral and written statement. DUENAS stated the following:

- He has been out of work from Marianas Cablevision since last year and is currently out of work.

- He was approached by a friend identified as Richard ICHIHARA to help look and sell "ice" to customers.

- ICHIHARA would provide the "ice" to him (DUENAS) and he would sell it averaging approximately six thousand ($6000.00) dollars a night. His (DUENAS) take on the money was between one thousand one hundred ($1,100.00) dollars to one thousand two hundred ($1,200.00) dollars.

- During the deals with customers, he would receive different power tools, electronic equipment and weapons to swap for "ice."

- The t.v.'s inside in the home were swap from the drug "ice."

- He indicated Joseph JONES, John SALAS, James PANGELINAN were the individuals who brought the stolen goods to swap for "ice."

- Frank ACFALLE arrived at the home with a someone, not known to him (DUENAS), and sold a "buggie" for three hundred ($300.00) dollars. The unknown individual was supposedly the owner and present during the purchase.

- He indicated rebar, blocks and cement were brought on different occasions from JONES and PANGELINAN to build his (DUENAS) home.

- The Nissan Frontier that was covered under a tarp, behind the shack area was brought by JONES who was dealt with by a relative, Richard PALOMO, for cash and or "ice."

- He indicated that all the items that were found on the property were in exchange for "ice."

- The firearms that were found were as a result of dealings with a male individual he (DUENAS) only knows as Bill-LNU of Yigo, and were trade for "ice."

- He concluded that the "ice" was to be sold everyday and a meeting point was scheduled for 9:00 p.m. by ICHIHARA at a location of his (ICHIHARA) choice. (Refer to written statement for details.)

13. At about 5:25 p.m., while at Tumon Precinct Command, Ofcr. Smith received a call from Assistant Attorney General, Diane Corbett that an outstanding warrant of arrest was issued for DUENAS and L. DUENAS under CF174-07 by Judge Lamorena.

14. In light of the information, DUENAS was arrested for the outstanding warrant of arrest and was later transported to the Hagatna Lock facility for processing and confinement.

Recommendation:

I recommend this case remain OPEN and forwarded to the Criminal Investigation Section for their follow up.

# GUAM POLICE DEPARTMENT

Government of Guam

Hagåtña, Guam

# CUSTODIAL INTERROGATION

## YOUR RIGHTS

Case No.: 1407·08944
Place: TPC
Date: 4/19/07
Time: 3:45 p

NAME: _RAYMOND JR. I. DUENAS_

Before we ask you any questions, you must understand your rights.

Do you understand? _YES RAJ_

You have the right to remain silent. You do not have to talk to me unless you want to do so.

Do you understand? _YES RAJ_

Anything you say can and will be used against you in a court of law.

Do you understand? _YES RAJ_

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

Do you understand? _YES RAJ_

If you cannot afford a lawyer, one will be appointed to your before questioning if you wish.

Do you understand? _YES RAJ_

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

Do you understand? _YES RAJ_

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_____
Signature

WITNESS: _____ #585

WITNESS: _SA TG. PANG, ID# ____

# GOVERNMENT OF GUAM
## GUAM POLICE DEPARTMENT

## STATEMENT FORM – PAGE (1)

Place Statement Taken: _TAMUUNG PRECINT_    Police Case Number: _____

Name: _Raymond M. T. Duenas_ Nationality: _Guamanian_ Time: _4:22pm_ Date: _4-19-07_

Address: _46 Seng-Song, Dededo Guam._ DOB: _3-12-74_ Home Telephone Number: _____ /257_

CI/ID/SER: SS Number: _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_    Occupation: _Cable TV Installer_

Employed By: _Al Tech Services. (Temp. Resignation) Sub Contractor_    Business Telephone No.: _683-4007_

---

**AFTER BEING ADVISED AND UNDERSTANDING MY CONSTITUTIONAL RIGHTS, I AM GIVING THE FOLLOWING STATEMENT FREELY AND VOLUNTARILY.**

---

My statement is to indicate all items I am about
to list is purchased by cash or meth. #1) Placma
TV's 46", 50", 19", 15" were brought to us by 10 individuals.
Joseph Jones & John Salas.
#2) Power tools & Jewelry's were brought to us by
Joseph Jones, John Salas 3 James Dangelinan.
#3) Buggie or Mule was brought by me through a
friend (Frank Acfalle) at the amount of $300.00 Person who
owned the Bugg is was present during Transaction.

THE ABOVE IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

WITNESS(ES) _____ SIGNATURE _____

WITNESS(ES) _____ TIME: _5pm_ DATE: _4/19/07_

TIME: _____ DATE: _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ 20 ____

_____
NOTARY PUBLIC IN AND FOR THE TERRITORY OF GUAM

3) Robars & Blocks were brought on different Occasions By Joseph Jones & James Dangelbran[?]

4) all vehicles on property are legal except a Nissan Frontier which was dealt with Joseph Jones & Friend By My Cousin Richard Palomo, Cash or Meth not known.

My wife and I with My Cousin Richard P. Bone dealt with Joseph Jones, John Salas, James Dangelinan by purchasing all items listed On Traded with Meth.

5) Firearms found On property were traded with Meth by My Cousin Richard & a Male Person named Bet (?) who is from the Village of Yigo.

6) I receive the drug "ICE" through a friend who needed help to find buyers & Customers named Richard Ichihara Fran Tamuning. All money's are given on a daily bases in the evening to Richard at a location Chosen by Richard.

THE ABOVE IS STATEMENT CONSISTING OF _____ PAGES IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

WITNESS(ES) _____ SIGNATURE: _____

WITNESS(ES) _____ TIME: 5pm DATE: 4/19/07

TIME: _____ DATE: _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____ 20 _____

_____
NOTARY PUBLIC IN AND FOR THE TERRITORY OF GUAM