

Duenas.memo

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortes
Hagåtña, Guam 96910
Telephone: (671) 472-7332/7283
Telecopier: (671) 472-7334/7215

**FILED**
DISTRICT COURT OF GUAM

OCT 2 2 2007

JEANNE G. QUINATA
Clerk of Court

Attorneys for United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL CASE NO. 07-00039 |
| Plaintiff, ) ) | GOVERNMENT'S BRIEF CONCERNING SUPPRESSION OF PHYSICAL EVIDENCE |
| vs. ) ) | |
| RAYMOND IGNACIO DUENAS, JR.., and, ) LOURDES CASTRO DUENAS, ) | |
| Defendants. ) | |

Per the court's instructions, this memorandum will focus on the defendant's motion to suppress property based upon media presence. Defendants' written motions raised three issues: knock-and-announce, failure to provide them with a copy of the search warrant, and the presence of media during the execution of the search, referencing the decision of Wilson v. Layne, 526 U.S. 603 (1999). They contend that all the evidence taken at the scene, regardless of the time it was seized or its subsequent chain of custody, should be suppressed because police unlawfully exceeded the scope of their warrant when they allowed media onto defendants' front yard during the search, and allowed them to photograph some of the larger items of seized property as they were being inventoried there.

Defendants contend that this constitutes a Fourth Amendment violation which renders the execution of the search warrant void *ab initio*. Defendants seek to suppress the seizure of all

evidence, whether it will be used by the government or not. Hence, defendants are seeking an exception to the exclusionary rule, which generally is limited to evidence which is the fruit of an illegal search or seizure and which the government seeks to use against the victim of police misconduct. <u>United States v. Leon</u>, 468 U.S. 897, 910 (1984). As well, they seek an exception to the general rule that, even if officers exceed the scope of their warrant by seizing items which are outside the permissible search, evidence which was legally seized will not be suppressed. <u>United States v. Tamura</u>, 694 F.2d 591 (9th Cir. 1982).

## I. SUMMARY OF ARGUMENT

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...." A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

In each case, the court must first determine whether an intrusion into one's property rights has occurred, and if so, whether that intrusion was reasonable. The courts balance the magnitude of the intrusion against the public and law enforcement interests the intrusion serves. This requires an analysis of the nature of the intrusion, which is alleged to be:

    1) the photographing of seized property;

    2) by representatives of the media;;

    3) who were standing on defendants' front lawn;

    4) taking photos of property which was otherwise lawfully seized

        before being placed on defendants' front lawn; and

    5) The photos were taken by by media representatives whom

        Guam police officers had allowed to walk onto and remain

        on the front yard.

This conduct does not implicate the Fourth Amendment because: 1) there is insufficient involvement by the police: 2) defendants have no constitutionally protected privacy right in the images of inanimate objects; 3) the defendants have failed to allege standing to object to

2

photographs being made of such property on the front lawn, and 4) the front lawn is an "open field" which is not protected by the Fourth Amendment. Any intrusion is *de minimis* and is outweighed by legitimate public and law enforcement concerns.

The location is particularly important. On any day of the year, anyone could legally drive down the dirt road, walk across defendants' front yard and knock on their front door. As discussed below, such an intrusion is not protected by the Fourth Amendment. The only restraint concerning access to defendants' property on April 19, 2007, was that imposed by the police for logistical purposes. This restraint was not imposed by the Constitution. Hence, the presence of media on the front lawn was constitutionally permissible.

Finally, even if such conduct was a violation of defendants' Fourth Amendment rights,i the evidence should not be suppressed.

## II. SUMMARY OF EVIDENCE

Prior to the execution of a valid search warrant on their residence April 19, 2007, Officer Frank Smith read the full search warrant and attachment to Ray Duenas, and put a copy in his front pocket. Reporters were not alerted to the pending warrant, nor were any media representatives on the scene at the time of entry onto the property, or for some hours thereafter. Reporters and cameramen went to the scene without invitation from authorities. Once there, however, they were allowed to remain on the front lawn, where officers were storing and inventorying the thousands of items which had been seized. They were not allowed to participate in the search, nor to handle any items being seized by officials. The media were confined to the front yard of the residence, and never entered any of the enclosed structures which were searched, nor did they assist in the discovery or seizure of any the evidence recovered there. The evidence seized consisted of contraband (controlled substances and paraphernalia), firearms, drug records and thousands of items of property. The photographs taken by the media were of various pieces of stolen property, with the intent that they be used for publication in the newspapers and on television, not for any police purpose.

3

Defendants had been arrested and transported from the scene before any representatives of the media arrived. Their persons were never photographed by media personnel At the press release, Sgt. Wade declined to identify them.

### III. THERE IS NO EXPECTATION OF PRIVACY IN ONE'S FRONT YARD

Fourth Amendment protections do not apply to open fields. Hester v. United States, 265 U.S. 57, 59 (1924). The curtilage–the area immediately surrounding a house–is afforded the same protection as the house itself. The extent of the curtilage is determined by factors that bear upon whether a person may reasonably expect that the area be treated as an extension of the home. Oliver v. United States, 466 U.S. 170, 180  In United States v.Dunn, 480 U.S. 294 (1987), DEA agents looked into a barn located about 50 yards from the fence which surrounded Dunn's house. To get to the barn, agents had to drive ½ miles from the public road, climb over the perimeter fence around his ranch, then climb over an interior fence, another barbed wire fence, and another wooden fence around the front of the barn. Despite these physical barriers, the Court held this conduct did not violate any of Dunn's Fourth Amendment protections, because the barn was not part of the curtilage of defendant's home.

The fenced back yard of a home is curtilage. United States v. Johnson, 256 F.3d 895 (9th Cir. 2001), but a fenced lot used by apartment residents and guests for parking, and visible from the street, is not part of the curtilage. United States v. Soliz, 129 F.3d 499, 502 (9th Cir. 1997).

The front yard of a home is not included in the curtilage, despite the home being at the end of a private road marked "no trespassing." United States v. Roberts, 747 F.2d 537, 542 (9th Cir. 1984). One's front lawn and front door are not curtilage. In United States v. Hersh, 464 F.2d 228 (9th Cir. 1972), two deputy sheriffs walked up to the defendant's house during the day, knocked on the front door, and saw drug and drug paraphernalia through the window. Hersh held that the officers were on an area which was not constitutionally protected: anyone could openly and peaceably walk up to the front door.

Thus, in the case before this court, defendants have no Fourth Amendment rights concerning searches or seizures by anyone–private or law enforcement--standing in their open, front yard.

4

## IV. THE FOURTH AMENDMENT REGULATES GOVERNMENT CONDUCT

The act of allowing the media to enter and remain in defendants' front yard does not implicate the Fourth Amendment, because the media were not acting as agents or instruments of the government.

A wrongful search or seizure by a private party does not violate the Fourth Amendment. Walter v. United States, 447 U.S. 649 (1980). If, however, the private party acts as an agent or instrument of the government, Fourth Amendment protections come into play. Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971). Thus, employees of a private carrier who open a package, whether lawfully or not, observe a white powder and notify the DEA, were not acting as agents of the DEA. The subsequent warrantless search of the package did not violate the Fourth Amendment. United States v. Jacobsen, 466 U.S. 109 (1984). When a private citizens works in associate with authorities, however, his conduct will be imputed to them. United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981).

Mere acquiescence in the search by a private party, or the failure to restrain him, is not sufficient police conduct to implicate the Fourth Amendment. See United States v. Miller, 688 F.2d 652 (9th Cir. 1982), where a theft victim advised officers he was entering defendant's premises to take pictures of his stolen goods; he was followed and observed by law enforcement for his own protection. "[W]e see no reason why the officers should have restrained him or discouraged him from visiting Miller's property." Id. at 657. Accompanying the victim when he returned to take photos did not transform [the victim's entry] into a police search, because the officer had done so "out of a concern for his safety, not out of any desire to reap the benefits of a private search." Id. at 658.

In this case, the sole connection between the police and the media is that the police did not invite, but allowed media representatives to enter and remain at the staging area on defendants' front yard and to photograph items as they were being tagged. The photographs being taken were not for police purposes, but solely for public information. The media presence did not expand the scope of police authority, or allow them to do something that otherwise they could not have done. United States v. Miller, 688 F.2d 652 (9th Cir. 1982).

5

Accordingly, the court should deny defendants' motion because there were insufficient connections between the police and the media to implicate Fourth Amendment protections.

## V. STANDING

During the evidentiary hearing on their motions, defendants questioned the procedures employed during the seizure of the thousands of items of stolen property taken from their residence. The implication, at least, is that they intend to argue that the manner in which the physical property was handled after its discovery also justifies its suppression.

Defendants can object to the police entry into their home, and seek to suppress everything which was seized as fruit of the poisonous tree. They cannot, however, object to the seizure of individual items on any other grounds unless they first show that they have some legitimate possessory interest in them. Thus, for example, defendants cannot object to the media photographing the items on the front yard, absent a showing of ownership or some lawful possessory interest in the property being photographed.

If they intend to raise this argument, defendants have the burden of proving that they had "a legitimate expectation of privacy" in the place which was searched and the property which was seized. Rakas v. Illinois, 439 U.S. 128, 140 (1978); United States v. Davis, 332 F.3d 1163, 1167 (9th Cir. 2003). There is no question that defendants have an expectation of privacy in their residence and areas within its curtilage. They have none, however, in their front yard.

There is no legitimate interest in the possession of contraband. Illinois v. Caballes, 543 U.S. 405 (2005). Nor do people have any Fourth Amendment interest in stolen property. Rakas, supra at 143, FN12. Thus, in United States v. Caymen, 404 F.3d 1196 (9th Cir. 2005), the court held that the defendant could not object to the search of the hard drive of his lap top computer, which he had obtained by use of a stolen credit card number, unless he first carried the burden of proving that he owned it.

## VI. PHOTOGRAPHING PERSONAL PROPERTY IS NOT A FOURTH AMENDMENT VIOLATION

It is important to re-emphasize that defendants seek a total suppression of the fruits of this search warrant, including the seizure of property which has been identified as relevant to the

6

government's case and which was never viewed or photographed by the media.  Defendant initially cited Wilson v. Layne, 526 .S. 603 (1999), as authority for their position. There have been a series of lawsuits under Bivens and 42 U.S.C. § 1983 related to alleged violations of the Fourth Amendment by law enforcement personnel. The first step taken by all these courts is to analyze whether police conduct has infringed upon a Fourth Amendment right at all. They look to: 1) whether the conduct occurred on premises, or concerned property rights–tangible or intangible–which are protected by the Fourth Amendment; and 2) whether the courts should recognize such conduct as a Fourth Amendment infringement.

The holdings of these cases can be summarized as follows: the Fourth Amendment protects certain tangible property interests, such as one's home or business or purse or person, and it protects the intangible right to privacy in one's person, to be free from embarrassment in certain circumstances. Thus, photographing a person may be a violation of his privacy. None of these cases, however, hold that there is a similar privacy interest in the images of inanimate objects.

A. Media and Tangible Property

Wilson emphasized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," citing United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 313 (1972). There was no question that the area which concerned the Wilson court was protected by the Fourth Amendment. Next, the Court considered whether allowing media representatives to be present during execution of a search warrant was conduct that should be constitutionally protected. Search warrants are issued by judges, directing authorized peace officers to search particular premises, for particular properties. Such warrants do not authorize anyone other than law enforcement officials to conduct searches and seizures. Because the presence of non-police individuals in the execution of a warrant is outside the scope of the permitted search, Wilson weighed the intrusion against whether there were legitimate governmental interests to be served by allowing media representatives in the home. The government had argued that media presence promoted a number of legitimate purposes: media ride-alongs further the general law enforcement objects of the police, publicize the government's efforts to combat crime, facilitate accurate reporting on law enforcement activities, and prevent

7

police abuses. The Court agreed these were all valid concerns, but they "fall short of justifying the presence of media inside a home.

The companion case decided the same day, Hanlon v. Berger, 526 U.S. 808 (1999), related to media which had been invited to attend the execution of a search warrant of defendant's curtilage (outbuildings), an area is constitutionally protected as part of the home.

In Artis v. United States, 802 A.2d 959 (2002), police allowed media to photograph their search of the defendant's fenced back yard, which the parties agreed was part of his residence. The issue turned on whether the exclusionary rule applied to evidence seized from the back yard.

B. Media and the Seizure of One's Person

The Fourth Amendment obviously protects the seizure of one's person. Terry v. Ohio, 392 U.S. 1, 16-17 (1968). It protects the seizure of intangible property as well, such as one's voice. Katz v. United States, 389 U.S. 347 (1967). The Fourth Amendment also protects the seizure of one's person through photography, if it infringes on the person's right of privacy.

Lauro v. Charles, 219 F.3d 202 (2nd Cir. 2000) concerned the New York City practice of deliberate, staged "perp walks" for the benefit of the media. The defendant was arrested and being interviewed by detectives when the police public information bureau telephoned the detective to advise him the media were interested in defendant's arrest. The detective handcuffed Lauro, walked him out of the police station, put him in a patrol car, drove around the block, then walked him back into the station, just so the media could televise the fact he had been arrested. Not surprisingly, he filed a § 1093 action.

First, the court considered whether Lauro had a reasonable expectation of privacy against being photographed–an intangible property right--under the circumstances. The government had argued that photos of a person in lawful custody do not constitute a government intrusion. The court cited Katz, supra at 351, that the Fourth Amendment protects "people, not places." The court held that photographing Lauro in such circumstances was unquestionably a seizure that intruded on his privacy interests and personal rights. Next, it balanced this intrusion against the policy reasons advanced by the state. "[D]espite its adverse effects on Lauro's dignity and privacy, the perp walk might nevertheless have been reasonable under the Fourth Amendment,

8

had it been sufficiently closely related to a legitimate governmental purpose." Id. at 212. The court recognized that the press and public have an interest in the accurate reporting of police issues. The problem here was that this was not the actual event of Lauro being arrested, but rather "a staged recreation of that event. Even assuming that there is a legitimate state interest in accurate reporting of police activity, that interest is not well served by an inherently fictional dramatization of an event that transpired hours earlier." Id. at 213. "[I]n staging the perp walk, Detective Charles engaged in conduct that was unrelated to the object of the arrest, that had no legitimate law enforcement justification, and that invaded Lauro's privacy to no purpose." Id.

Caldarola v. County of Westchester, 343 F.3d 570 (2nd Cir. 2002) applied the same analysis but concluded that no protected interests had been violated. The defendants were corrections officers who had been investigated for fraudulently receiving disability benefits. They were told to report to Department of Corrections headquarters, where they were arrested. Each defendant was filmed by the County as they were escorted across the DOC parking lot to cars which took them to the police station for booking. The County then held a press conference to publicize its investigation and "crackdown" of fraudulent job injury claims. Id. at 572. During the press conference, the County played the videos of the defendants walking across the DOC parking lot in handcuffs. The County also announced the time of their arraignment, guaranteeing that media would be there to photograph the arrestees when they were brought *en mass* into the courthouse. The court affirmed that the Fourth Amendment protects unreasonable seizures by photograph. United States v. Villegas, 899 F.2d 1324 (2nd Cir. 1990). The question was, "whether conceptualized as a seizure of Freeman's image or an exacerbation of his arrest, the County's act of videotaping Freeman constitute a seizure under the Fourth Amendment." Id. at 575. The court considered the purposes for which the videos were made: "the County created and distributed the videotape to inform the public about its efforts to stop the abuse of disability benefits by its employees." Id. at 576. The video was highly newsworthy, of great interest to the public; it enhanced the transparency of the justice system, and could deter others from the same conduct. Publicizing the arrests could also allow the public to come forward with additional information relevant to the investigation. Because there was a minimal expectation of privacy in

9

the DOC parking lot, the arresting officers did not unreasonably exceed the scope of what was necessary to effect the arrests (i.e., no staged perp walk such as in Lauros), and there were legitimate governmental purposes for the video, the court held that the County's conduct did not implicate the Fourth Amendment.

Whether the government's conduct serves a legitimate purpose is extremely important in determining whether its conduct is reasonable, and hence, not in violation of the Fourth Amendment. Polk v. District of Columbia, 121 F.Supp.2d 56 (D.C. 2000) involved a § 1983 action against a detective who allowed a civilian friend to accompany him during a *Terry* stop. The civilian was not an authorized "ride-along." Worse, the detective actually used him to assist in the investigation by representing that he was an officer, and by allowing him to confine one of the individuals while the detective questioned the other. The court held that the stop clearly was a seizure within the meaning of the Fourth Amendment. Even if it was supported by reasonable suspicion, the use of the civilian "exacerbated the propriety of the seizure that occurred when he stopped the plaintiffs." Id. at 67. The use of the civilian did not even remotely serve any legitimate public purpose. Hence, this conduct constituted an unreasonable seizure and thus a violation of the plaintiffs' Fourth Amendment Rights.

Gibbons v. Lambert, 358 F.Supp.2d 1048 (D. Utah 2005) involved the indictment, and ultimate acquittal, of a man believed to be using his house for distributing drugs to minors and for drug use and possible sexual assaults on young women while under the influence of alcohol or drugs. He complained that, after he was arrested inside his home the night of the search warrant, officers delayed escorting him to a police vehicle until the press were set up to photograph him. The press were on public property, i.e., a place which is not protected by the Fourth Amendment. The court held that, even if a perp walk had occurred,

> "[C]onsidering the seriousness of the allegations and because many of the potential victims were unknown, the broadcast of Gibbons' face during the arrest was a legitimate law enforcement purpose because it served as notice to potential victims that an investigation against Gibbons was ongoing and that any further information was being requested. In addition to that purpose, the perp walk also made public law enforcement's efforts in dealing with what had become known as the "rave" scene– parties involving young people consuming a variety of

10

controlled substances." Id. at 1072.

The "level of intrusiveness was far from that in both Wilson and Lauro," and "several legitimate law enforcement purposes were served by having the media present to witness Gibbons being escorted from his house. ..." Id.

Finally, this balancing test was employed in Thompson v. State of Indiana.824 N.E.2d 1265 (Ill. 2005), where an ordinarily routine and proper strip search for cocaine was rendered outrageous because a female cameraman filmed the search, right on down to the defendant with his underpants down, bending over with his buttocks exposed. Not satisfied with that footage, she zoomed in for a close shot, which revealed a white substance between his buttocks. Given the nature of the intrusion, and the lack of any public policy served by it, the court deemed this search unreasonable.

## VII. THERE WAS NO FOURTH AMENDMENT VIOLATION AT THE DUENAS RESIDENCE

As the cases above illustrate, there is no authority for defendants' position, that there is a protected privacy interest in images of physical property placed upon their open front yard..

1) There is no authority that photographing inanimate objects constitutes an unreasonable seizure, of such an intrusive nature as to justify protection under the Fourth Amendment. All the cases on point deal with photographing the person or a protected area of his home. There is no authority to extend Fourth Amendment protections to the situation where private citizens photograph inanimate objects. Even assuming that one had standing to contest such a seizure, it is not sufficiently intrusive to raise a Fourth Amendment question.

2) The media were standing on property which was not constitutionally protected. The defendants' front lawn, where there was no privacy interest. The § 1983/Bivens cases cited above, Wilson, Hanlon, and Artis, all concern media presence on property which is clearly protected by the Fourth Amendment: one's home or one's curtilage. Any other day of the week, any member of the public, media included, could have driven down the dirt road, parked on defendants' front yard, and photographed any objects there. If the media could have lawfully

11

filmed property in plain view on defendants' lawn the day before the raid, why was it illegal to do so on April 19?

3) The only police conduct of which defendants can complain is that, after seizing the larger items, police carried them onto the front yard for processing, thus exposing them to public view. Before defendants can challenge this action, however, they have to show a possessory interest in the property photographed.

4) The media were not present at the invitation of the police, but having arrived, they were allowed to stay for legitimate reasons. Their presence advanced several important law enforcement and public purposes, as were recognized by Wilson. In addition, disseminating information about the stolen goods which had been recovered encouraged victims to claim their property, and encouraged the public to come forward with other information concerning the defendants' criminal conduct.

For all these reasons, if any intrusion occurred, it did not rise to the level of a Fourth Amendment violation.

## VIII. APPLICATION OF THE EXCLUSIONARY RULE

Assuming that allowing the media to be present in defendants' front yard was a Fourth Amendment violation which unlawfully expanded the scope of the search warrant, such evidence should not be suppressed.

United States v. Hendrixson, 234 F.3d 494 (11th Cir. 2000) dealt with media representatives who arrived after the police had executed the search warrant and begun the search of co-defendant Stephen's home. Id. at 496. It acknowledged the general rule, that evidence "discovered on account of the police exceeding the scope of a proper search" must be suppressed." Id. at 497. It was undisputed that the media had done nothing to aid in the execution of the warrant. The court discussed that the purpose of the Fourth Amendment was to prevent general warrants, in particular, to require police to limit their search to the area, and the items, authorized by a court. It held that "media presence did not expand the scope of the search (the search actually carried out by the police themselves) beyond that allowed by the terms of the warrant" Id. at 497. Accordingly, the exclusionary rule would not apply.

12

In Artis v. United States, supra at 802 A.2, the defendant initially raised the issue that a television news crew had been invited to join police in the search of his home and fenced back yard. Id. at 968. Although he failed to alleged that they had assisted in the recover of weapons and ammunition found in the yard, by the time of this appeal there had already been uncontradicted testimony that the police had recovered the evidence on their own. The court agreed, citing United States v. Leon, 468 U.S. 897, 910 (1984), that the exclusionary rule is limited to cases where the prosecution seeks to use the fruits of an illegal search or seizure against "the victim of police misconduct."

RESPECTFULLY SUBMITTED this 22nd day of October, 2007.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: /s/ Karon V. Johnson
KARON V. JOHNSON
Assistant U.S. Attorney