

raymondduenasstate

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 472-7332
Telecopier: (671) 472-7334

Attorneys for the United States of America

**FILED**
DISTRICT COURT OF GUAM

OCT 26 2007

JEANNE G. QUINATA
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 07-00039 |
| Plaintiff, | GOVERNMENT'S BRIEF CONCERNING SUPPRESSION OF STATEMENTS BY RAYMOND DUENAS |
| vs. | |
| RAYMOND IGNACIO DUENAS, JR., and LOURDES CASTRO DUENAS, | |
| Defendants. | |

### I - SUMMARY OF EVIDENCE

Defendants were arrested. Officer Frank Smith read the search warrant and attachment to Raymond Duenas, and put a copy in his front pocket. Raymond Duenas complained of pain and was examined by a medic at the scene. After he was transported to the Tamuning Precinct, DEA S/A Michelle Jong and S/A Than Churchin talked to him in a small interview room. S/A Jong noticed he had trouble walking. When he said his ankle and chest hurt; she asked that medics be summoned. While waiting, S/A Jong took a personal history (a 202 Form) and explained that she and S/A Churchin were there because of allegations of illegal drugs at his residence. She explained this could lead to federal charges, which carried substantially higher penalties than provided by Guam law, and talked briefly about assistance in the drug investigation as a possible way to avoid such penalties. After S/A Jong advised him of his *Miranda* rights, defendant

hesitated and said he had been arrested before and worked with the cops, but it didn't work out. The medics arrived, Officer Smith arrived, and defendant was taken to GMH for treatment. S/A Jong's explanation was based upon the way this case had been divided for prosecution: the DEA and ATF intended to adopt the case as it concerns guns and drugs, and the Guam Police Department was going to pursue the stolen items.

Defendant had known Officer Smith since 1995, they were installers for the business which is now Marianas Cablevision. They worked as partners for that year and became good friends. While defendant was waiting on a gurney in the hall outside the Emergency Room (a common occurrence) he called Officer Smith over by name and said, "Frank, about that property at my house ... " Officer Smith declined to talk to him until after he had been treated. Defendant was taken in for examination, and Officer Smith left for the Attorney General's office. Later, Officer Smith was advised that defendant had been returned to the Tamuning precinct. In fact, defendant had been taken into the precinct conference room, a very large area, by the DEA. S/A Jong again gave him *Miranda* warnings. She confirmed that illegal drugs had been found at this residence, talked about the benefit of assisting in the investigation and said that a federal public defender could be called to advise him if he wanted to cooperate. Defendant said he wanted to talk to an attorney. She and DEA S/A Churchin left the conference room and advised Officer Smith accordingly.

After talking to S/A Jong, Officer Smith went into the conference room, where defendant was waiting to be transported to the Department of Corrections. Officer Smith asked the defendant, "How are you doing, Ray? OK?" Defendant told Officer Smith "I don't want to talk to the Feds, they scare me. I'll talk to you." Officer Smith advised defendant of his rights again; defendant executed the GPD rights form and indicated he was willing to talk to Officer Smith. Although their initial discussion concerned the stolen property at defendant's residence, defendant ultimately admitted he had acquired it by trafficking in methamphetamine. After a verbal interview, he completed a written statement about 5 p.m., and was lodged at DOC.

- 2 -

## II. THE LAW

The government has the burden of proving that defendant's confession was voluntary. Miranda v. Arizona, 384 U.S. 436 (1966) held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Those safeguard were spelled out in the universally-familiar Miranda warnings. If the defendant sought to invoke those safeguards, interrogation must cease. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicate that he wants one before speaking to police, they must respect his decision to remain silent." Id. at 473-474.

This decision has resulted in a vast body of case law regarding whether and when a person is in custody, whether he was subjected to custodial interrogation, what rights he invoked, how clearly or how equivocally he evoked those rights, and so on. After M*iranda* was issued, many situations arose where a person in custody would invoke the right to counsel, or the right to remain silent, but officers would continue the interrogation, either subtlely or not so subtlely. The Court put an end to these practices in Edwards v. Arizona, 451 U.S. 47 (1981), where the defendant at first agreed to talk to investigators, but then said he wanted an attorney before making a deal. Questioning ceased, he was lodged in jail, but the next morning he was brought before two different detectives, who said they wanted to talk to him further and again gave him *Miranda* warnings. After listening to the taped statement of the co-defendant, Edwards said he would talk, but didn't want it recorded. The Court held the statement should have been suppressed. "[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation if he has been advised of his

rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 484-85.

Edwards put special protections around the right to counsel. It did not disturb prior case law concerning the invocation of other *Miranda* rights. See, for example, Michigan v. Mosley, 423 U.S. 96 (1975), where the defendant invoked his right to remain silent, interrogation ceased, but later he agreed to talk to other detectives who were investigating a different crime, and who again advised him of his rights before asking him questions about the separate offense. The Court allowed officers to initiate a second approach of the defendant if questioning had ceased when he first invoked his rights, a substantial interval of time had passed, the defendant was given a fresh set of *Miranda* warnings; and the subject of the second interrogation was unrelated to the first. These rules do not apply to the Edwards situation, however, because after one has invoked one's right to counsel, officials may not initiate further interrogation.

Edwards noted "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Id. at 482, *citing* Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

This case presents an interesting variation from the normal Edwards arrest-interrogation-invocation of rights scenario, because defendant had been advised of his rights by the DEA agents, then told Officer Smith he wanted to talk about the stolen property at his house. He later invoked his right to counsel after the DEA agents indicated they were investigating the drugs which had been found at his house. But did this invocation apply to Officer Smith, who was with a different agency, investigating a different crime? As well, it was not improper for Officer

- 4 -

Smith to enter the conference room, because defendant had to be taken to DOC in any event. Did it constitute custodial interrogation, however, to ask the defendant how he was doing?

A. Selective Invocation of the Right to Counsel

The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." Michigan v. Harvey, 494 U.S. 344 (1990). It is not required by the Fifth Amendment, but rather is "justified only by reference to its prophylactic purpose." Connecticut v. Barrett, 479 U.S. 523 (1987). The request for counsel must be unambiguous. Davis v. United States, 512 U.S. 452, 459 (1994). If the defendant has first requested counsel, and then affirmatively volunteers a remark to officials, it is frequently a hotly contested issue whether his conduct was an initiation of contact. For example, in United States v. Fontana, 948 F.2d 796 (9th Cir. 1991), the defendant had invoked his right to counsel. Later, as he was being transported to another facility, he asked the transporting officer what was going to happen to him? The officer responded by reminding him he did not have to talk, that he had requested an attorney, and that anything he said had to be of his own free will. The court held that defendant's inquiry constituted an initiation of contact, because it evidenced a "willingness and a desire for a generalized discussion about the investigation." Id. at 806. The facts that the officer advised him of the consequences of his question, and secured a written waiver of defendant's rights, were important.

The defendant can change his mind about wanting counsel to be present. United States v. Michaud, 268 F.3d 728, 737 (9th Cir. 2001) (initial invocation of right to counsel followed by decision to discuss case.) As well, the defendant can invoke his right to counsel concerning some questions, but not others. In Bruni v. Lewis, 847 F.2d 561 (9th Cir. 1988), the defendant, who had a long criminal record, was questioned after being arrested and advised of his rights. When asked if he would answer questions, he initially said "Not without my attorney," but then added, "Well, ask your questions, and I will answer those I see fit." The court held that the second statement "effected a selective waiver by indicating an agreement to answer some

- 5 -

questions but not others. Therefore, to the extent Bruni later chose to answer questions, he waived his right to counsel." Id. at 564.

Connecticut v. Barrett, 479 U.S. 523 (1987) concerned a similar issue. The defendant, after receiving his *Miranda* warnings, said he would not make a written statement without counsel present, but he would talk to police about the charges. The Court held that his oral statements were admissible. He had made a "limited" invocation of his right to counsel, which was consistent with Miranda, in that he fully understood he had a right to choose between speech and silence, and he chose to speak. Id. at 529.

The evidence here demonstrates that defendant did not intend to invoke his right to counsel at all, as it concerns talking to Officer Smith. The following supports this conclusion: 1) defendant knew Officer Smith; 2) he attempted to talk to Officer Smith about stolen property at the hospital, shortly after the DEA agents had read his first *Miranda* warnings; 3) the DEA agents made it clear their interest was in controlled substances, and securing defendant's assistance against drug traffickers; 4) the DEA agents had suggested defendant might want an attorney to explain the penalties associated with federal charges and the advantages of providing substantial assistance; and 5) the first words out of defendant's mouth was that he didn't want to talk to the Feds, they scared him, but he wanted to talk to Officer Smith. His statements demonstrate that he had fully understood the *Miranda* warnings which the DEA had twice read to him, and that he was making a reasoned decision to decline cooperation concerning the agents' drug investigation, but he was willing to talk about the stolen property

B. What Constitutes Interrogation

The second question is whether Officer Smith's inquiry concerning his health constituted interrogation for Edwards purposes.

Rhode Island v. Innis, 446 U.S. 291 (1980) specifically discussed the meaning of "interrogation." There, the defendant had been arrested on suspicion that he had committed an armed robbery of a taxi driver. He did not have the gun, however, when he was arrested in an

- 6 -

area close to a school for handicapped children. He was handcuffed, and given his <u>Miranda</u> warnings; he said he wanted to speak to an attorney. He was placed in a police car and driven away from the scene. En route, one of the transporting officers told another that there were a lot of handicapped children running around the area, and he hoped that none of them would find the weapon and shells and hurt himself. Defendant interrupted their conversation, told the officers to turn the car around, that he would show them where the gun was located. He led them to a field where he had hidden the shotgun used in the robbery. Later, he moved to suppress this statement.

The Court referenced <u>Miranda</u>: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. This includes more than direction questioning. The Court held that *"Miranda* safeguards some into play whenever a person in custody is subjected to either express questioning or its functional equivalent." This means not only express questioning, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. at 301. On other hand, because the police should not be held accountable for "unforeseeable results of their words or actions, "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." <u>Id.</u> at 302.

Turning to the facts of the case, the Court concluded that Innis was not "interrogated" with the meaning of <u>Miranda</u>. The conversation between the two transporting officers was not express questioning, nor was it the functional equivalent of questioning. There was nothing in the record to reflect that the officers expected to elicit an incriminating response from Innis, or that they were "aware that the respondent was particularly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to

- 7 -

suggest that the police knew that [Innis] was unusually disoriented or upset at the time of his arrest." Id. at 302-03. The Court noted this was a short conversation, far different from situations where officers harangued the suspect. The comments were not particularly evocative.

In Shedelbower v. Estelle, 885 F.2d 570 (9th Cir. 1989), the defendant was interviewed concerning a horrendous rape and murder case. He was advised of his rights, made some statements, then asked for an attorney. The officers placed him under arrest and told him he would have to wait until arraignment the next day before a public defender could be appointed. As the officers gathered their materials, one of them told defendant that his co-defendant was in custody (true) and that the surviving victim had identified defendant's photo as one of the assailants (not true). Then defendant said he had to tell somebody, that he wanted to talk about the case and he didn't need an attorney present. The officers left, called a prosecuting attorney for advice, then returned to the interview room and re-advised defendant. He confessed, but later moved to suppress his statements. The court affirmed the admission of his confession. It first held that the officer's remark did not constitute express questioning. Next, it considered whether remarks about the co-defendant or the victim had been reasonably designed to elicit an incriminating or exculpatory response from defendant. It decided they were not the functional equivalent of questioning because they did not call for nor elicit an incriminating response. "They were not the type of comments that would encourage [the defendant] to make some spontaneous incriminating remark." Id. at 573. Next, the court considered whether the defendant's statements when the officers returned, about one hour after he had said he wanted to talk to an attorney, was based on his own initiation of further discussion, and a valid waiver of his right to counsel. The court concluded that saying he had to tell somebody "evinced a willingness and a desire for a generalized discussion about the investigation," *citing* Oregon v. Bradshaw, 462 U.S. 1039 (1983). The court also considered what weight, if any, should be given to the fact that after defendant invoked his right to counsel, the police spoke again instead of immediately leaving the room. Given that their remarks were not an invitation to further discuss

- 8 -

Case 1:07-cr-00039    Document 85    Filed 10/26/2007    Page 8 of 9

the crime, and given that they consulted with a prosecutor before returning to continue questioning about the offense, the court held that defendant had initiated the subsequent discussion. The court quoted Colorado v. Spring, 479 U.S. 564 (1987), there was a two-part test to determine whether the defendant had validly waived his *Miranda* rights. First, the relinquishment of the right must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Shedelbower, 885 F.2d at 573. Thus, given the totality of the circumstances, the court concluded that Shedelbower's waiver was knowing and intelligent

### III. SUMMARY OF ARGUMENT

Defendant only partially invoked his right to counsel. He made a reasoned decision to talk to his friend, Officer Smith, about the stolen property at his residence, but not to talk to DEA agents, who were suggesting a thoroughly "scary" scenario, that he begin working for them. Officer Smith's initial question about defendant's physical condition was not "interrogation" as defined by Miranda and Edwards, because it was not intended to elicit statements about defendant's criminal conduct. Rather, it was a reasonable question to ask prior to taking him to DOC. As soon as defendant indicated he wanted to talk to Officer Smith, Officer Smith advised him of his *Miranda* rights, the third time defendant had heard them that day. There was no coercion on the part of either Officer Smith or the DEA agents. Under the totality of the circumstances, defendant's statements were freely and voluntarily given, and he made a knowing waiver of his right to counsel.

RESPECTFULLY SUBMITTED this 26th day of October, 2007.

LEONARDO M. RAPADAS  
United States Attorney  
Districts of Guam and the NMI

By: *[signature]*  
KARON V. JOHNSON  
Assistant U.S. Attorney